**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

UNITED STATES OF AMERICA    :
                                 :
                                 :
       v.                        :       CRIMINAL ACTION NO.
                                 :       1:11-CR-480-RWS
MATHIAS THOMAS KOPP,    :
                                 :
       Defendant.            :

**ORDER**

     This case comes before the Court on Defendant Mathias Thomas Kopp's

Motion to Dismiss Petition to Revoke Supervised Release [18]. After a review

of the record, the Court enters the following order.

**Background**

     Defendant Kopp is a United States citizen who was sentenced to serve

seven years and eight months in prison by the Republic of Hungary on March 8,

2002. Dkt. No. [18-1]. Defendant was convicted of "rape to the detriment of a

minor who has not yet completed her 12th year." Id.

     Because he is a U.S. citizen, Defendant requested a transfer under the

Council of Europe's Convention on the Transfer of Sentenced Persons, to

which the United States is a signatory. <u>See</u> Convention on the Transfer of Sentenced Persons, Mar. 21, 1983, 35 U.S.T. 2867 [hereinafter "Transfer Treaty"]. Under the Transfer Treaty, a receiving state "shall not aggravate, by its nature or duration, the sanction imposed in the sentencing State . . ." <u>Id.</u> at art. 10. Pursuant to the Hungarian sentence, Defendant's full sentence release date was February 14, 2009. Dkt. No. [18-2].

In April 2004, the United States Parole Commission determined that Defendant should serve the full term of his Hungarian sentence. Dkt. No. [18-4]. However, the Commission determined that if Defendant earned good time credit, he could be released from prison as early as February 19, 2008, with the remaining time until his full term release date to be served on supervised release. <u>Id.</u> If Defendant did not receive good time credit, his prison release date would be February 14, 2009, with no supervised release. <u>Id.</u>

On October 5, 2007, the Bureau of Prisons [hereinafter "BOP"] filed a certificate in the Eastern District of North Carolina seeking to civilly commit Defendant as a sexually dangerous person under the Adam Walsh Act, 18 U.S.C. § 4248. <u>See</u> <u>United States v. Kopp</u>, 5:07-hc-2185-BO (E.D.N.C.). The filing of this certificate stayed Defendant's release pending the conclusion of

2

the civil commitment proceeding. <u>See</u> 18 U.S.C. § 4248(a). Defendant then filed suit challenging the constitutionality of the Adam Walsh Act. His case was consolidated with other similarly situated cases and stayed pending the Supreme Court's decision in <u>United States v. Comstock</u>, __ U.S. __, 130 S. Ct. 1949 (2010).

On October 29, 2010, following the Supreme Court's decision, the district court in the Eastern District of North Carolina granted Defendant's Motion to Dismiss and ordered that he be released within 30 days. <u>See</u> <u>United States v. Kopp</u>, 5:07-hc-2185-BO (E.D.N.C.) at Dkt. No. [24]. However, Defendant was never released, likely due to a stay from the Fourth Circuit. The Fourth Circuit ultimately reversed the district court's dismissal order. <u>See</u> <u>United States v. Broncheau</u>, 645 F.3d 676, 687 (4th Cir. 2011).

In October 2011, Defendant entered into a settlement agreement with the Government. According to the Government, in exchange for the Government's dismissal of its civil commitment petition against Defendant, Defendant agreed to serve an additional three-year term of supervised release. Dkt. No. [20] at 5; <u>see</u> <u>United States v. Kopp</u>, 5:07-hc-2185-BO (E.D.N.C.) at Dkt. No. [53]. However, the court Order dismissing the petition and enforcing the settlement

3

agreement stated that Defendant "shall comply with the terms of supervised release as set forth in the Transfer Treaty Determination pursuant to 18 U.S.C. § 4106A, in connection with [Kopp's] Foreign conviction." Id. at Dkt. No. [54]. The Transfer Treaty Determination said that Defendant would serve a maximum of seven years and eight months, inclusive of supervised release. Dkt. No. [18-4]. Therefore, the governing documents indicate that Defendant did not agree to a three-year extension of supervised release, but rather reaffirmed that he would serve out his original Hungarian sentence and its corresponding days-to-serve cap.

Defendant was released from prison and placed on supervised release on October 17, 2011. In November 2011, Defendant's supervised release jurisdiction was transferred to this Court. His supervised release was modified to include 180 days of residence at Dismas Charities, Inc. and participation in electronic monitoring.

On April 9, 2012, the United States Probation Office [hereinafter, "USPO"] petitioned this Court for a warrant and order to show cause why Defendant's supervised release should not be revoked. Dkt. No. [3]. Specifically, the petition alleged that Defendant had not resided at Dismas

4

Charities, had not followed the rules of that facility, and had not participated in electronic monitoring. Id. On June 19, 2012, the Daytona Beach Police Department arrested Defendant for trespassing. On June 21, 2012, the United States Marshals arrested Defendant and on June 29, 2012, he was taken before Magistrate Judge Scofield. Dkt. Nos. [5, 7]. Following Defendant's arrest in Florida, the USPO amended its petition to include Defendant's Florida crime and absconding from the district without permission.

## Discussion

Defendant has now moved this Court to dismiss the Government's Petition to Revoke Supervised Release. Dkt. No. [18]. Specifically, Defendant alleges: (1) that he was not released from prison until after the expiration of his Hungarian sentence so no further supervised release is authorized; (2) that his October 2011 settlement agreement with the government is void because it exceeded the original Hungarian sentence in violation of the Transfer Treaty;[1] and (3) that he was never within the BOP's "legal custody" and, accordingly,

---

[1] As discussed above, Defendant apparently did not agree to three additional years of supervised release. Instead, the Order enforcing the settlement agreement affirmed Defendant's sentence of seven years and eight months, inclusive of prison and supervised release time. Therefore, Defendant's agreement with the Government accords with the Hungarian sentence and the Transfer Treaty.

AO 72A
(Rev.8/82)

the BOP never had the authority to pursue civil commitment proceedings against him. Id.

In response, the Government argues, *inter alia*, that Defendant cannot collaterally attack his supervised release sentence in a motion to dismiss. Rather, his exclusive remedy to attack his sentence's validity is via a habeas corpus petition under 28 U.S.C. § 2255. See Dkt. No. [20].

This Court agrees with the Government that Defendant cannot challenge the validity of his sentence with the present motion. As the Eleventh Circuit has stated, a person serving a supervised release term is "in custody" for purposes of § 2255. See United States v. Brown, 117 F.3d 471, 475 (11th Cir. 1997) ("Therefore, we conclude that, as a person serving a term of supervised release, Brown was 'in custody' within the meaning of § 2255 . . ."). And, because "a sentence is presumed valid until vacated under § 2255," United States v. Almand, 992 F.2d 316, 317 (11th Cir. 1993), this Court cannot entertain any challenges regarding the validity of Defendant's sentence. Instead, Defendant must file a § 2255 motion in the Eastern District of North Carolina to do so. See

AO 72A
(Rev.8/82)

id. (quoting United States v. Francischine, 512 F.2d 827, 828 (5th Cir. 1975))[2] (finding that "the underlying validity of a conviction cannot be asserted as a defense in a probation revocation proceeding, that the conviction's validity may be collaterally attacked only in a separate proceeding under 28 U.S.C. § 2255, and that a district court has jurisdiction to consider a petition for revocation of probation as if the underlying conviction were unquestioned, until such time as the conviction has been judicially set aside.").

However, even though Defendant cannot attack his sentence here, this Court must determine what Defendant's sentence actually was and whether he has already served it. Defendant was sentenced by the Hungarian court on March 8, 2002 to seven years and eight months in prison. Dkt. No. [18-1]. The Hungarian authorities identified a full term release date of February 14, 2009. Dkt. No. [18-2]. The Hungarian sentence did not contain a supervised release provision. In its Transfer Treaty Determination, the United States Parole Commission determined that Defendant should serve the full term of his foreign

------

[2] The U.S. Court of Appeals for the Eleventh Circuit adopted as binding precedent the decisions of the U.S. Court of Appeals for the Fifth Circuit handed down prior to September 30, 1981. Bonner v. City of Prichard, 661 F.2d 1206, 1207 (11th Cir. 1981).

sentence. Dkt. No. [18-4]. However, the Commission projected a release date with good time credit of February 19, 2008. Id. The Commission further determined that following Defendant's release from prison, he should serve "a 36 month period of supervised release, or until the full term date of [Defendant's] foreign sentence currently calculated to be 02-14-2009, whichever is earlier." Id. In other words, consistent with the Transfer Treaty, which prohibits this country from increasing the duration of Defendant's Hungarian sentence, Defendant's combined term of imprisonment and supervised release was capped at the February 14, 2009 full term release date.

Due to the government's attempt to have Defendant civilly committed under the Adam Walsh Act, Defendant was not released from prison until October 17, 2011. The inquiry now is whether the time Defendant spent imprisoned awaiting a civil commitment determination counts toward his Hungarian sentence.

Defendant argues that because he was not released from prison prior to the expiration of his foreign sentence, his full term sentence was served and no further supervised release term was authorized. Dkt. No. [18] at 5-7. The Government responds that when the BOP certified Defendant as a sexually

dangerous person on October 5, 2007, Defendant's imprisonment

became civil in nature and he was no longer serving as a result of the foreign

conviction. Dkt. No. [23] at 9. Therefore, he served only six years and ten

months of his criminal sentence and was subject to a remaining supervised

release term of 319 days. Id.

This Court agrees with Defendant. There is no dispute that Defendant

was imprisoned for almost two and a half years beyond his foreign sentence.[3]

The Government cites no authority for bifurcating Defendant's prison time

between "criminal" and "civil" where no civil commitment actually resulted in

order to evade the Transfer Treaty's restrictions on increasing Defendant's

sentence. The time Defendant spent in prison awaiting a civil commitment

determination completed the full term his Hungarian sentence. Therefore,

---

[3] The reason for Defendant's prolonged detention is troubling. The government's attempt to civilly commit Defendant under the Adam Walsh Act persisted for over four years without even a merits hearing. No civil commitment resulted. This Court, like others, perceives serious due process issues with holding detainees for indeterminate periods without governmental justification at a merits hearing or a civil commitment determination. See United States v. Broncheau, 645 F.3d 676, 687 (4th Cir. 2011) (Wynn, J., concurring) (raising "serious constitutional questions related to the due process rights of Respondents" where Respondents were detained for years under 18 U.S.C. § 4248 without governmental justification for their detention at a merits hearing).

under the Transfer Treaty, extending Defendant's sentence with supervised release is not authorized.

This case is distinguishable from those relied on by the Government in its brief, which involve defendants sentenced in the United States to prison, followed by separate, defined terms of supervised release. See Dkt. No. [23] at 1-6. Under those facts, courts have found that the term of a defendant's supervised release does not begin until the defendant is actually released from confinement, even when the defendant has served excess time in prison. See United States v. Johnson, 529 U.S. 53, 60 (2000) (excess time in prison does not count toward reducing a supervised release term); ( Tobey v. United States, 794 F. Supp. 2d 594, 595 (D. Md. 2011) (prisoner's detention following certification as a sexually dangerous person delays the start of the prisoner's supervised release period). In these cases, the courts focus on the unique purpose of supervised release – to rehabilitate and to transition offenders back into society. See United States v. Buchanan, 638 F.3d 448, 451 (4th Cir. 2011) (citations omitted) ("Supervised release is not a punishment in lieu of incarceration. Rather, it is a unique method of post-confinement supervision that fulfills rehabilitative ends, distinct from those served by incarceration. The

congressional policy in providing for a term of supervised release after incarceration is to improve the odds of a successful transition from the prison to liberty."); <u>Johnson</u>, 529 U.S. at 59 ("Congress intended supervised release to assist individuals in their transition to community life. Supervised release fulfills rehabilitative ends, distinct from those served by incarceration."); <u>Tobey</u>, 794 F. Supp. 2d at 600 ("It is hard to imagine how the purpose of helping prisoners 'transition' could be served where supervised release begins before the offender even reenters the community."). However, the facts and rationale in these cases do not apply here.

In this case, the sole purpose of supervised release was to ensure that Defendant served his entire foreign sentence. Unlike U.S. sentences where a full term of supervised release is mandated regardless of how much time a defendant spends in confinement, Defendant's supervised release term was entirely dependant on how long he served in prison. Due to the unique circumstances of his foreign conviction and the Parole Commission's Transfer Treaty Determination, Defendant's supervised release simply rounded out his foreign sentence in the event he was released from prison before his February 14, 2009 full term release date. It was always the case that if Defendant served

11

seven years and eight months in prison, his sentence would be complete and supervised release would not be warranted.

Defendant served his Hungarian sentence of seven years and eight months in confinement. Therefore, Defendant has no remaining supervised release term.

### Conclusion

In accordance with the foregoing, Defendant's Motion to Dismiss Petition to Revoke Supervised Release, Dkt. No. [18], is **GRANTED.**

**SO ORDERED** this  6th  day of September, 2012.


_____
RICHARD W. STORY
UNITED STATES DISTRICT JUDGE

12